AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

```
LODGED
CLERK, U.S. DISTRICT COURT

5/12/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ D _____ DEPUTY
```

United States of America
v.
MARIUS OPREA,
  aka "Tomas Mesik,"

     Defendant(s)

Case No.   2:23-mj-02436-duty

```
FILED
CLERK, U.S. DISTRICT COURT

MAY 12 2023

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY
```

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

    I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

As described in the accompanying attachment, defendant violated the following statutes:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 1344, 1349, 1028A | Conspiracy to Commit Bank Fraud, Aggravated Identity Theft |

    This criminal complaint is based on these facts:

    *Please see attached affidavit.*

☒ Continued on the attached sheet.

                        /s *Rene Persaud*
                        *Complainant's signature*

                        Rene Persaud, Special Agent
                        *Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   5/12/2023

                        *Judge's signature*

City and state:   Los Angeles, California

               Hon. Jacqueline Chooljian, U.S. Magistrate Judge
                      *Printed name and title*

AUSA Andrew Brown, 11th Floor, x0102

**Complaint Attachment**

<u>Count One, 18 U.S.C. § 1349</u>

Beginning in or before 2023, and continuing through at least May 12, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendant MARIUS OPREA, aka "Tomas Mesik," ("Defendant"), and others, conspired to commit bank fraud, in violation of Title 18, United States Code, Section 1344.  The object of the conspiracy was carried out, and to be carried out, in substance, as follows:   Defendant would secretly install skimming devices in ATMs to record the account information of bank customers, and would then counterfeit debit and credit cards bearing that information.  Defendant and his co-conspirators would use the counterfeit cards to withdraw funds in the names of those victims of identity theft.  Federally-insured financial institutions defrauded as a result of this conspiracy include Bank of America.

<u>Count Two, 18 U.S.C. § 1028A</u>

Beginning in or before 2023, and continuing through at least May 12, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendant MARIUS OPREA, aka "Tomas Mesik," knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person during and in relation to a felony violation of Title 18, United States Code, Section 1349, Conspiracy to Commit Bank Fraud, as charged in Count One, knowing that the means of identification belonged to another actual person.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**AFFIDAVIT**

I, Rene Persaud being duly sworn, declare and state as follows:

I.   **SEEKING COMPLAINT AND FOLLOW-ON SEARCH WARRANT**

1.   On May 12, 2023, I executed federal search warrants issued by the Honorable Charles F. Eick, U.S. Magistrate Judge, for the residence and vehicle used by MARIUS OPREA for evidence of an ATM skimming operation.  The affidavit for those search warrants is attached and incorporated by reference.

2.   This affidavit is made in support of a complaint against MARIUS OPREA for conspiracy to commit bank fraud, and aggravated identity theft, in violation of Title 18, United States Code, Sections 1344, 1349, and 1028A, for running an ATM skimming crew.

3.   This affidavit also seeks a search warrant for the storage unit used by MARIUS OPREA for evidence of conspiracy to commit bank fraud, conspiracy to launder money, and aggravated identity theft, in violation of Title 18, United States Code, Sections 1344, 1349, 1956, and 1028A (the TARGET OFFENSES), as described in Attachment B, which is incorporated by reference.  The STOARGE UNIT was discussed in the incorporated affidavit, but at the time I did not know the unit number.

II.   **PREMISES TO BE SEARCHED**

4.   The premises to be searched is a storage unit utilized by OPREA, namely:

a.   UNIT C210, EXTRA SPACE STORAGE, 2585 WEST 5TH STREET, OXNARD, CA (the "STORAGE UNIT"), described more fully in attachment A-1, which is incorporated by reference.

III. **PROBABLE CAUSE**

    **A.**    **Evidence Discovered During Search Warrants on May 12, 2023**

    5.    During the execution of the search warrants at the residence and vehicle used by OPREA (described as the TARGET RESIDENCE and TARGET VEHICLE in the incorporated affidavit), law enforcement officers recovered the following, among other evidence:

    1.    Over 20 cloned ATM cards;

    2.    A card reader (used to read cards with magnetic strips, like ATM cards);

    3.    A fraudulent Slovakian passport and ID card in the name "Tomas Mesik" (one of the names used to receive skimming devices as described in the incorporated affidavit) but bearing the photograph of OPREA;

    4.    Over $2,000 USD in cash;

    5.    A cellular phone containing photos of over 100 cloned ATM card numbers, multiple ATM skimmers, and pin-hole cameras.

    6.    A business card for storage UNIT C210 at EXTRA SPACE STORAGE, 2585 WEST 5TH STREET, OXNARD, CA (the STORAGE UNIT).

    6.    As described in the incorporated affidavit, OPREA and his co-conspirators accessed a storage unit in Building C of EXTRA SPACE STORAGE located at 2585 WEST 5TH STREET, OXNARD, CA on March 21, 2023. Specifically, they were seen transporting the distinctive yellow boxes in which the ATM skimmers had been shipped.

    7.    I previously went to EXTRA SPACE STORAGE in a failed effort to identify OPREA's storage unit. During that visit, I described to the manager the vehicle OPREA was then using (called the First Tiguan in the incorporated affidavit). Together we went through the surveillance video at EXTRA SPACE STORAGE and recognized the First

2

1  Tiguan, but at the time he had no way of checking which unit was
2  associated with that vehicle.  When I returned on May 12, 2023, and
3  identified UNIT C210 as the one I was interested in, the manager said
4  that the First Tiguan we had previously discussed was associated with
5  UNIT C210.

6  **B.   OPREA Interview Post Miranda**

7  8.   On May 12, 2023, OPREA was interviewed by myself, SA Meghan
8  Carton, and an FBI Romanian Linguist in the bedroom the TARGET
9  RESIDENCE. OPREA's restraints were removed for the interview, and an
10 FBI Romanian Linguist translated his Miranda Rights for him. OPREA
11 acknowledged that he understood his rights and wished to speak to law
12 enforcement. During his interview, I confronted OPREA with photos
13 taken of him while he installed ATM skimmers and illegally withdrew
14 cash from victim customer accounts. OPREA confirmed he was the
15 individual in those photos, but claimed he was checking the balance
16 of his Revlux financial account. OPREA said he knew that Kimpian and
17 Vlaic (who are his co-conspirators) were going to cut their
18 electronic monitoring, and claimed he warned them not to do so
19 because he arranged their bail. OPREA claimed he was in the US trying
20 to claim asylum and find work. OPREA said he worked with Kimpian and
21 Vlaic, but they got mad at him. OPREA did not specify what type of
22 work he did with them. OPREA also acknowledged that he knew Mereuta
23 and Bunus (who were also arrested for ATM skimming), and said that
24 they worked with ATMs. While OPREA initially claimed to be "Tomas
25 Mesik," the name on his fraudulent Slovakian passport, he later
26 admitted that his true name was MARIUS OPREA.  OPREA later invoked
27 his right to speak with an attorney, and all questioning of him
28 ceased immediately.

3

### C.   OPREA's Criminal Associates Discusses Fleeing on Jail Call, Cuts Monitoring Device, and Continue Fraud

9.   As discussed in the incorporated affidavit, Kimpian (the recipient of ATM skimmers from abroad) was arrested in March 2023 for local charges related to ATM Skimming. At the time of his arrest, Kimpian was arrested with a criminal associate named Marius Vlaic who participated in the ATM skimming scheme. While incarcerated at the Ventura County Pretrial Detention Facility, Kimpian and Vlaic made multiple phone calls on a recorded line. An FBI Romanian Linguist listened to these phone calls and provided me with a summary of their contents.

10.   During one of these calls, Vlaic spoke to a man named "Catalin". Vlaic told "Catalin" that he wanted to skip bail and return to Romania. "Catalin" advised Vlaic to remember that the call was recorded and be careful with what he says.

11.   In April 2023, Kimpian and Vlaic were released from state custody and placed on electronic monitoring. On April 11, 2023, according to the Ventura County District Attorney's Office, electronic monitoring placed Kimpian and Vlaic in the vicinity of a gas station in Oxnard, CA. Surveillance video from this gas station captured Vlaic meeting in the parking lot with OPREA, Mereuta, and Bunus. During this trip, OPREA was driving a gray Volkswagen Tiguan bearing California plate 9EES670 and VIN 3VV3B7AX9NM169760 ("TARGET VEHICLE"). I reviewed the still shots from this surveillance video and I was able to confirm the identities of OPREA, Mereuta, Bunus, and Vlaic as the individuals meeting in the parking lot of the gas station.

4

12.    In the days following this meeting, both Kimpian and Vlaic removed their electronic monitoring devices without permission and fled to parts unknown. On May 10, 2023, Investigator Jill Jensen of the San Diego Bureau of Public Assistance Investigations informed me that Kimpian and another unknown male (UM2) were captured on surveillance video installing a point-of-sale skimming device in San Diego County on May 8, 2023. I reviewed the still shots of this incident, and I was able to confirm Kimpian's identity as one of the two individuals coordinating the installation of the skimming device.

### D.    OPREA's Immigration Status

13.    According to immigration records, OPREA entered the U.S. in August 2013 on a D-1 Visa. Immigration records indicate an "unconfirmed departure" from the U.S. in September 2013. Based on these records, it appears that OPREA either significantly overstated his visa, or he returned to the U.S. without passing through a legal port of entry (i.e., was smuggled back into the U.S.).

### E.    Evading Prosecution by Using AirBnbs and Peer-to-Peer Rental Cars

14.    Based on business records obtained during this investigation I was able to determine that OPREA and his co-conspirators rented the TAGET RESIDENCE for $3,500 per month, starting in March 2023, from D&A Luxury Rentals. D&A Luxury Rentals is an apartment rental service that leases properties directly and through AirBnb. The TARGET RESIDENCE AirBnb I searched was rented by an individual going by the alias "Serban". In my training and experience, members of transnational ATM skimming crews often use one or more alias names to rent vehicles, property, and open bank

accounts in order to prevent law enforcement from discovering their whereabouts.

15.   During surveillance observations that occurred at the TARGET RESIDENCE between March 2023 and May 2023, OPREA and his co-conspirators were seen using at least two vehicles during that time frame: the First Tiguan and the TARGET VEHICLE.

16.   In my training and experience, members of Romanian ATM skimming crews know that they will be photographed committing their crimes at ATMs, and know that law enforcement will look for them after enough victims in a given area complain about having been defrauded.  Their primary defense to arrest and prosecution is to maintain a nomadic lifestyle in which they frequently switch rental cars and temporary residences, such as Airbnbs, in order to stay ahead of law enforcement. Typically they will rotate their crimes through different cities, states, and even countries.  Some actually "confess" if caught by the local police red-handed, but claim it was their "first time" in order to secure a low bail amount, so they can skip out on it with little cost.

17.   In this particular case, members of this Romanian ATM skimming crew installed skimmers in and around Ventura County, then cashed out the cloned cards as far east as San Bernardino County. In addition, the TARGET VEHICLE was likely rented from a peer-to-peer car rental service by OPREA to be used while conducting ATM skimming activity. Peer-to-peer car rental services are not associated with a major vendor (National, Budget, Hertz, etc.) and are usually run by individuals or private companies that do not scrutinize the identities or driving history of their customers. Such services are popular amongst sophisticated criminal groups, such as this one, in

order to conduct criminal activity and avoid detection from law
enforcement.

IV.   **CONCLUSION**

18.   Based upon the foregoing facts, I believe there is probable
cause to believe that OPREA violated Title 18, United States Code,
Sections 1344, 1349, and 1028A, and the evidence of the TARGET
OFFENSES will be found in the STORAGE UNIT.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this /2ᵗʰ day of May,
2023.



_____
UNITED STATES MAGISTRATE JUDGE

# **AFFIDAVIT**

I, Rene Persaud being duly sworn, declare and state as follows:

## I. **INTRODUCTION**

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since September 2018.   Prior to becoming a SA, I worked for the FBI's Special Surveillance Group for approximately four years.   Prior to joining the FBI, I was a Deputy Sheriff for the Hillsborough County (Florida) Sheriff's Office for approximately three years.

2.    I have participated in various aspects of criminal enterprise investigations, including but not limited to, conducting surveillance and arrests, issuing subpoenas, seizing and impounding drug evidence, social media analysis, and the analysis of telephone tolls and other data.   Additionally, I have interviewed and/or debriefed confidential informants and other witnesses who have had knowledge regarding the investigations in which I have been involved. I have also authored, sworn out, and executed multiple search warrants for various entities, including but not limited to, internet service providers, social media companies, GPS tracking units, and physical residences/businesses.

3.    I also have extensive experience investigating Romanian Organized Criminal Groups. I have conducted investigations in the Los Angeles area related to the ATM skimming activity and money laundering, and I have also traveled to Romania on multiple occasions to work with National Police forces in several cities in order to obtain information, coordinate investigations, and identify criminals who travel from Europe to the United States to defraud the American banking system.

## II.  **PURPOSE OF AFFIDAVIT:   SEARCH WARRANTS**

4.    This affidavit is made in support of search warrants for the temporary residence shared by EUGEN MIHAI MEREUTA, ANDREI EMANNUEL BUNUS, and MARIUS OPREA, and the rental vehicle that OPREA drives, for evidence of conspiracy to commit bank fraud, conspiracy to launder money, and aggravated identity theft, in violation of Title 18, United States Code, Sections 1344, 1349, 1956, and 1028A (the TARGET OFFENSES), as described in Attachment B, which is incorporated by reference.

5.    The information set forth in this affidavit is based upon my participation in the investigation, encompassing my personal knowledge, observations and experience, as well as information obtained through my review of evidence, investigative reports, and information provided by others, including other law enforcement partners.  As this affidavit is being submitted for the limited purpose of securing the requested warrants, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause for the requested warrants.

### III. **PREMISES TO BE SEARCHED**

6.    The premises to be searched are:

a.    432 EAST CLARA STREET, PORT HUENEME, CA (the "TARGET RESIDENCE"), described more fully in attachment A, which is incorporated by reference.

b.    GRAY VOLKSWAGEN TIGUAN, California plate 9EES670, VIN 3VV3B7AX9NM169760, registered to Diana Antwan, and driven by MARIUS OPREA ("TARGET VEHICLE").

IV. **STATEMENT OF PROBABLE CAUSE**

   **A. Summary of Investigation**

   7.    FBI Los Angeles has been investigating a transnational ATM skimming group that received multiple shipments of ATM and Point-of-Sale skimmers hidden in stereo equipment delivered to commercially rented mailboxes in Ventura County, CA. Members of this group were located at a house in Port Hueneme, CA where they transported the ATM and Point-of-Sale skimmers to a storage unit and installed ATM skimming devices at multiple banks. In addition, members of this group were arrested for conducting unauthorized cash withdrawals from victim customer accounts in Chino Hills, CA. The individuals identified conducting these acts were EUGEN MIHAI MEREUTA, ANDREI EMANNUEL BUNUS, and MARIUS OPREA.

   **B. Background on ATM Skimming and Access Device Fraud**

   8.    Based on my training and experience in investigating fraudulent schemes of this nature, I know the following about Access Device Fraud: ATM skimming devices are manually installed at walk-up or drive-thru ATM terminals. The card readers are surreptitiously inserted into the ATM card reader slots, and are often thin enough to go unnoticed to a lay person using an ATM. In addition to the card reader, another device is installed to obtain the PIN number. This device is often a covert camera that captures customers entering their PIN number.

   9.    An ATM skimming device is installed for a specified period of time after which the subjects who installed the device will return to the ATM and remove it. Once the device is removed, the customer credit card numbers and PIN numbers are retrieved from the device. The card numbers are then loaded on to blank cards so the

3

perpetrators can travel to ATMs and fraudulently withdraw funds from victim customer accounts.

10.   In addition to ATM skimmers, there are also devices known as Point-of-Sale skimmers. These devices are built to mimic the Point-of-Sale terminals at commercial businesses such as pharmacies, grocery stores, gas stations, and department stores. Because of the near identical design, these devices are installed by simply snapping them on top of legitimate Point-of-Sale terminals in order to steal customer data when they complete their purchases at the above listed establishments. The data from these Point-of-Sale skimmers can be retrieved by recovering the device and downloading the data, or by downloading via Bluetooth when in close proximity to the device.

**C. Skimmers Shipped to California and Recipient Conducts Cash Outs**

11.   According to Romanian Law Enforcement, in January 2023, a package was shipped via FedEx from Vienna, Austria to a "Roman Janecek" at P.O. Box 111, Camarillo, CA, a commercially rented mailbox located at Postal Magic, 5235 Mission Oaks Blvd, Camarillo, CA.   The package was described as "audio equipment", however inspection by European authorities determined the "audio equipment" was actually a speaker system hollowed out and filled with ATM skimming devices. The speaker system in this incident was packaged in a distinct, yellow and black box:

1

 

2
3
4
5
6
7
8
9
10

11    12.   According to Romanian Law Enforcement, on March 2, 2023, a

12  similar package also listed as "audio equipment" was shipped via

13  FedEx from Vienna, Austria to a "Roman Janecek" at P.O. Box 111,

14  Camarillo, CA. European authorities also inspected this package and

15  determined the audio equipment was a Bluetooth speaker system

16  hollowed out and filled with ATM and Point-of-Sale skimming devices.

17  Neither of these packages were seized even though they contained

18  criminal tools; both were delivered as addressed by FedEx, according

19  to their business records.

20    13.   On March 19, 2023, Romanian law enforcement informed me

21  about the contents of the packages and provided photographs of the

22  skimming devices identified during the inspections. I reviewed the

23  photographs of the packages and their contents and confirmed that the

24  contents of the packages were in fact ATM and Point-of-Sale skimming

25  devices, based on my training and experience working Romanian

26  organized crime investigations during which I have seized several ATM

27  and Point-of-Sale skimming devices. The listed recipient of the

28  packages was "Roman Janecek".

14.   According to investigative reports from the Ventura County District Attorney's Office, a "Roman Janecek" was arrested on March 24, 2023, on charges related to ATM Skimming. The Ventura County District Attorney's Office provided me with booking photos from the arrest of "Roman Janecek". I immediately recognized "Roman Janecek" to be Paul Kimpian. I know this because Romanian Law Enforcement previously provided me with Kimpian's photo and informed me that he may be a part of this ATM skimming crew. Based on a comparison of the booking photo and the photos provided by Romanian Law Enforcement, I was able to confirm that "Roman Janecek" is actually Paul Kimpian.

15.   According to Romanian law enforcement, the group that mailed the skimmers in the stereo speakers was known to have been operating in the U.S. as of late 2022, and may have been operating here earlier.

### D.   Romanian Information Leads to TARGET RESIDENCE

16.   According to information provided by Romanian law enforcement, in February 2023 a member of the ATM skimming crew placed a phone call to D&A Luxury Rentals, an apartment rental service. Business records for D&A Luxury Rentals indicated that an individual going by the alias "Serban" rented an Airbnb located at 432 EAST CLARA STREET, PORT HUENEME, CA ("TARGET RESIDENCE"). I conducted surveillance at this address on March 21, 2023 and observed a Volkswagen Tiguan bearing California license plate 9CCW084 (hereafter referred to as the "First Tiguan"; this is not the TARGET VEHICLE) parked on EAST CLARA STREET, directly in front of the TARGET RESIDENCE. During surveillance operations between March 27-31, 2023, MEREUTA, BUNUS, and OPREA, who are all part of the ATM skimming crew according to Romanian Law Enforcement and were identified from their

6

official booking/ID/other photographs, were observed entering and exiting the TARGET RESIDENCE and using the First Tiguan.

### E. Surveillance Links Delivery Address of Skimming Devices to TARGET RESIDENCE

17.    On March 27, 2023, I traveled to Postal Magic at 5235 Mission Oaks Boulevard, Camarillo—the commercial mail receiving agency to which the ATM skimmers had been sent. While waiting in the parking lot, I observed the First Tiguan park in the vicinity of 5235 Mission Oaks Boulevard. I observed an unidentified male (UM1) exit the vehicle and walk inside Postal Magic. I could not determine which P.O. Box UM1 accessed, however he exited with a brown box large enough to contain the stereo equipment mentioned earlier and departed the area in the First Tiguan. As stated earlier, the First Tiguan was previously observed at the TARGET RESIDENCE on March 21, 2023. According to license plate reader cameras, the First Tiguan was seen in the vicinity of the TARGET RESIDENCE as far back as March 6, 2023.

18.    Business records from Postal Magic indicated that Kimpian used his "Roman Janecek" false identity to open P.O. Box 111 (which received the ATM skimmers). According to these business records, Kimpian listed the Passport number BB8339022 for his "Roman Janecek" false identity on his registration documents for P.O. Box 111. This is the same fraudulent passport that Kimpian had on his person when he was arrested in Ventura County, CA in March 2023. As stated above, "Roman Janecek" was the intended recipient of two packages that contained ATM skimming devices.

19.    Based on my training and experience, sophisticated criminals try to avoid having contraband sent directly to their residences in hopes of avoiding detection.  Instead, they often

7

1  employ commercial mail receiving agencies to receive contraband.

2  More cagey and sophisticated criminals may take the additional step

3  of renting the mailbox under an assumed name, as Kimpian did here.

4         **F.    Additional Skimmers Shipped in Yellow & Black Boxes**

5         20.   As stated above, Romanian Law Enforcement informed me that

6  two packages were shipped to Kimpian's "Roman Janecek" false identity

7  in January and March 2023 from a sender in Vienna, Austria. The

8  sender of those packages shipped a third package from Vienna, Austria

9  to a "Tomas Mesik" at a different commercial mail receiving business

10 in Oxnard, CA on or about March 27, 2023, via FedEx. This package,

11 described as an "audio system", was inspected by European authorities

12 who determined the "audio system" was actually a speaker system

13 hollowed out and filled with Point-of-Sale skimming devices. The

14 speaker system in this incident was packaged in the same yellow and

15 box as previous skimmer shipments.

  

22       **G. Surveillance Links TARGET RESIDENCE to Storage Unit**

23       21.   On March 31, 2023, surveillance was conducted at the TARGET

24 RESIDENCE. During this surveillance, MEREUTA, BUNUS, and OPREA were

25 observed exiting and entering the TARGET RESIDENCE on multiple

26 occasions. At one point, MEREUTA, BUNUS, and OPREA were observed

27 loading suitcases, plastic bags and two yellow and black boxes, like

28 the ones the skimmers had been shipped in, into the First Tiguan. The

three of them departed the TARGET RESIDENCE, and traveled directly to Extra Space Storage located at 2585 West 5TH Street, Oxnard, CA.

22.   According to surveillance video obtained from Extra Space Storage, which I viewed, MEREUTA, BUNUS, and OPREA arrived together at Extra Space Storage in the First Tiguan. They unloaded the suitcases, plastic bags, and the two yellow and black boxes onto a cart, then entered Building C within Extra Space Storage. Minutes later, all three exited Building C, without any of the items loaded onto the cart, and departed the area in the First Tiguan.

23.   The yellow and black boxes loaded onto the cart at Extra Space Storage are identical to the distinct, yellow and black box used to ship speakers filled with ATM skimming devices in January 2023.

 

24.   Based on my training and experience, sophisticated criminals know that law enforcement may eventually locate their residence. In order to build a buffer between their residence and the discovery of criminal activity, these sophisticated criminals will often use storage rental facilities to house the contraband necessary to conduct their crimes, as they did in this case.

**H. OPREA Drives from the TARGET RESIDENCE to Install an ATM Skimmer on April 6**

25.   On or about April 6, 2023, I conducted surveillance at the TARGET RESIDENCE. At approximately 6:23 AM, I observed the First Tiguan parked inside a car port within the apartment complex that includes the TARGET RESIDENCE. At approximately 7:33 AM, OPREA departed the TARGET RESIDENCE, driving the First Tiguan, and drove directly to Bank of America located at 670 Town Center Drive, Oxnard, CA. This Bank of America branch was located approximately 7.3 miles away from the TARGET RESIDENCE. During this trip, OPREA drove past multiple Bank of America branches much closer to the TARGET RESIDENCE. Upon arrival, OPREA drove to the south end of the parking lot to an area out of view of ATM surveillance cameras. OPREA (wearing a green hat, black hooded sweatshirt, and gray shorts) then walked to the ATM terminal and conducted an unknown number of transactions for approximately 5 minutes. OPREA then returned to the First Tiguan and departed the area.

26.   Bank of America was notified that their ATM may have been compromised and they were asked to review their security footage. According to the Bank of America Global Financial Crimes Compliance team, the surveillance video at the ATM clearly showed OPREA installing an ATM skimming devices in the card reader.

**I.   OPREA Drives from the TARGET RESIDENCE to Install Another ATM Skimmer on April 10**

27.   On or about April 10, 2023, I conducted surveillance at the TARGET RESIDENCE. At approximately 7:12 AM, I observed the First Tiguan parked inside a car port within the apartment complex that contains the TARGET RESIDENCE. At approximately 8:43 AM, OPREA departed the TARGET RESIDENCE, and drove the First Tiguan directly to

10

1  Bank of America located at 2698 East Main Street, Ventura, CA. This
2  Bank of America branch was located approximately 12 miles away from
3  the TARGET RESIDENCE. During this trip, OPREA drove past multiple
4  Bank of America branches much closer to the TARGET RESIDENCE. Upon
5  arrival, OPREA parked in the neighboring shopping center, an area out
6  of view for ATM surveillance cameras. FBI Task Force Officer (TFO)
7  Geoff Elliot observed OPREA (wearing a green hat, black hooded
8  sweatshirt, and gray shorts) then walk to the ATM terminal and
9  conducted an unknown number of transactions for several minutes.
10  OPREA then returned to the First Tiguan and departed the area.

11      28.   Bank of America was notified that their ATM may have been
12  compromised and they were asked to review their security footage.
13  According to the Bank of America Global Financial Crimes Compliance
14  team, the surveillance video at the ATM clearly showed OPREA
15  installing an ATM skimming devices in the card reader.

16  **K.    MERUTA and BUNUS, Who Used the TARGET RESIDENCE, Were Arrested**
17  **for ATM Skimming on May 1**

18      29.   According to Fraud Investigator Andy Capps of the San
19  Bernadino Department of Human Services, on or about May 1, 2023,
20  surveillance was conducted at the Wells Fargo branch located at 3289
21  Grand Avenue, Chino Hills, CA. At approximately 6:00 AM, a black Ford
22  Explorer arrived in the vicinity of the Wells Fargo Branch and two
23  individuals, later identified as MEREUTA and BUNUS, exited the
24  vehicle and began to make multiple transactions at the ATM terminals.
25  Investigator Capps and other law enforcement officers made contact
26  with MEREUTA and BUNUS and arrested them for Grand Theft. An analysis
27  of the transactions from the two ATMs used by MEREUTA and BUNUS
28  determined that between 6:01 AM and 6:03 AM, they accessed 8 debit

11

cards and successfully conducted unauthorized cash withdrawals from 7 of those cards resulting in a total loss of $5,900.

30.   MEREUTA and BUNUS were in possession of a total of 11 cloned debit cards, and subsequent victim interviews performed by Investigator Capps determined that all the victims resided in Santa Barbara and Ventura counties, where surveillance had seen OPREA install skimmers, as described above. Additionally, none of the victims authorized MEREUTA or BUNUS to access their accounts. MEREUTA was read his Miranda Rights and refused to speak to law enforcement.

**L.    BUNUS Minimized His Involvement, But Admitted to ATM Fraud**

31.   BUNUS was read his Miranda Rights and agreed to speak to Investigator Capps with the assistance of a Romanian translator. BUNUS claimed that he and MEREUTA, whom he referred to as "Mike", stayed at motels all over Los Angeles, and they had recently met. BUNUS said that another man, who was not Romanian, gave them the "ATM cards" and told them to go to a bank and withdraw funds. BUNUS claimed he was told that he could keep any money he withdrew at an ATM from those cards.

**M.    OPREA Uses the TARGET VEHICLE and TARGET RESIDENCE**

32.   In April 2023, Kimpian was released from state custody and given a date for his next court appearance. On April 11, 2023, according to investigators from the Ventura County District Attorney's Office, surveillance video from a gas station in Ventura County showed Kimpian meeting with OPREA and BUNUS. During this trip, OPREA was driving the GRAY VOLKSWAGEN TIGUAN bearing California plate 9EES670 and VIN 3VV3B7AX9NM169760 (the TARGET VEHICLE).

33.   On April 20, 2023, FBI Task Force Officer (TFO) Geoff Elliot observed the TARGET VEHICLE parked in the rear car port of the

TARGET RESIDENCE. On April 25, 2023, TFO Elliot observed OPREA arrive at the TARGET RESIDENCE, driving the TARGET VEHICLE, and park in the rear car port. On May 8, 2023, Investigator Heather Tallent observed the TARGET VEHICLE parked on Clara Street, directly in front of the TARGET RESIDENCE.

34.   The TARGET VEHICLE was registered to a Diana Antwan in El Cajon, CA. Based on my training and experience, the TARGET VEHICLE was likely rented from a peer-to-peer car rental service by OPREA to be used while conducting ATM skimming activity. Peer-to-peer car rental services are not associated with a major vendor (National, Budget, Hertz, etc.) and are usually run by individuals or private companies that do not scrutinize the identities or driving history of their customers. Such services are popular amongst sophisticated criminal groups, such as this one, in order to conduct criminal activity and avoid detection from law enforcement.

**Training and Experience Regarding Identity Theft and ATM Skimming**

35.   From my training and experience, and from discussions with other government officials, I know the following:

a.   Members of ATM skimming crews maintain specialized equipment including skimmers, thin metal tools (often custom fabricated) to aid in the surreptitious insertion and removal of the skimmers, spy cameras to record PINs entered by customers, and magnetic strip reader-writers for counterfeiting ATM cards.  Often times they possess plastic or metal housings designed to camouflage the spy cameras and make them blend in with the ATM.  Often they have these custom made at plastic- or metal-working shops.  Typically they have a stock of blank magnetic-strip cards, sometimes repurposed from gift cards, onto which they can write their stolen account

information.  The crew members usually write the PIN codes for the cards directly onto the counterfeits they produce.

b.    Members of transnational ATM skimming crews typically enter the country either legally with a visa, if they have no criminal record and can pose as a legitimate tourist or business person, or through established immigrant-smuggling rings in Mexico and Canada otherwise.  Oftentimes the crew members maintain false identity documents, which they use if arrested to make it harder to identify them.  Some maintain false passports so that they can abscond if granted bail and flee the country.

c.    Members of transnational ATM skimming crews have various ways of handling the proceeds of their offenses.  Some is kept in cash for routine expenses.  Some is usually deposited into a local bank account to pay for items for which cash would raise suspicion, such as rental cars and housing.  The bulk, however, is sent abroad either to their co-conspirators or home countries.  This may be as simple as sending cash hidden among other items abroad through carriers such as DHL, or transfers through Hawalas, Western Union, or similar services.  More recently, the trend has been to purchase cryptocurrencies for cash.

d.    Individuals involved in identity theft schemes like this one must keep evidence of their schemes, such contact information for their co-conspirators, lists of victim information and accounts used in the scheme, simply to keep the scheme going.  Much of this evidence is now stored on digital devices such as computers and smartphones.

e.    Generally, perpetrators of skimming and identity theft schemes maintain this evidence where is close at hand and safe, such

14

1    as in their residences, automobiles, and, especially with

2    smartphones, on their person.  For larger or more sophisticated

3    frauds, participants often attempt to distance themselves from some

4    of the incriminating evidence by renting public storage units or

5    safety deposit boxes where they often keep the items they will not

6    need immediate access to.

7         f.    I have heard of cases in which card skimmers have

8    embossed their own names on the front of counterfeit access devices

9    so that they could use the counterfeit cards openly and with their

10   own identification cards.  I know from my training and experience

11   that card skimmers and counterfeiters often re-encode gift cards that

12   have no value left on them as credit or debit cards.  This is both

13   convenient for them as they can get their counterfeit stock for free

14   and it makes the cards appear legitimate without elaborate additional

15   printing on them of logos and the like; the counterfeit credit and

16   debit cards simply appear to be a gift card from a store.  Both these

17   techniques will likely prevent law enforcement from being able to

18   tell if the facially legitimate looking cards are actually part of

19   the skimming scheme just from seeing at them.

20        g.    Members of a criminal conspiracy must of necessity

21   communicate with one another.  Commonly this is done by text, email,

22   telephone, or specialty communication application, often an encrypted

23   one such as WhatsApp, and most often by smartphone.  Members of the

24   conspiracy commonly carry their smartphones, which include the

25   contact information for their co-conspirators, on or near their

26   persons, such as in their cars or residences.

27

28

VI.   **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**[1]

36.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

16

files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

37.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take

17

1   substantial time, particularly as to the categories of electronic

2   evidence referenced above.  Also, there are now so many types of

3   digital devices and programs that it is difficult to bring to a

4   search site all of the specialized manuals, equipment, and personnel

5   that may be required.

6         b.   Digital devices capable of storing multiple gigabytes

7   are now commonplace.  As an example of the amount of data this

8   equates to, one gigabyte can store close to 19,000 average file size

9   (300kb) Word documents, or 614 photos with an average size of 1.5MB.

10   38.   The search warrant requests authorization to use the

11   biometric unlock features of a device, based on the following, which

12   I know from my training, experience, and review of publicly available

13   materials:

14         a.   Users may enable a biometric unlock function on some

15   digital devices.  To use this function, a user generally displays a

16   physical feature, such as a fingerprint, face, or eye, and the device

17   will automatically unlock if that physical feature matches one the

18   user has stored on the device.  To unlock a device enabled with a

19   fingerprint unlock function, a user places one or more of the user's

20   fingers on a device's fingerprint scanner for approximately one

21   second.  To unlock a device enabled with a facial, retina, or iris

22   recognition function, the user holds the device in front of the

23   user's face with the user's eyes open for approximately one second.

24         b.   In some circumstances, a biometric unlock function

25   will not unlock a device even if enabled, such as when a device has

26   been restarted or inactive, has not been unlocked for a certain

27   period of time (often 48 hours or less), or after a certain number of

28   unsuccessful unlock attempts.  Thus, the opportunity to use a

18

biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, if while executing the warrant, law enforcement personnel encounter a digital device within the scope of the warrant that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to every person who is located at the SUBJECT PREMISES during the execution of the search who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of the warrant: (1) depress the person's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of the face of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

d.    In my training and experience, transnational ATM skimmer crews often reside together to better coordinate their

efforts.  This is especially true for persons involved in installing
ATM skimming devices, like OPREA, and producing counterfeit cards,
which requires specialized tools and equipment.  The last search
warrant I executed on such a residence yielded a skimming lab that
covered the dining room table; the residence housed four different
crew members, all of whom pled guilty to a federal felony.  I have
not seen a skimming operation in which non-criminal participants were
also present.  Indeed, it would be foolhardy to have non-criminal
participants present at such a lab, as the illegal conduct would be
visible to them, and they might inform the authorities or otherwise
compromise the secrecy the crew members require.

39.  Other than what has been described herein, to my knowledge,
the United States has not attempted to obtain this data by other
means.

## VII. **CONCLUSION**

40.  Based upon the foregoing facts and my training and
experience, I believe there is probable cause to believe that
evidence of the TARGET OFFENSES, listed in Attachment B, will be
found at the TARGET RESIDENCE and in the TARGET VEHICLE.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 10th day of May,
2023.


UNITED STATES MAGISTRATE JUDGE

20